The decision below is signed as a decision of

the court.

Signed: September 04, 2007.



S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                           )
                                )
MONICA L. BRISCOE,              )       Case No. 06-00458
                                )       (Chapter 13)
            Debtor.             )
                                )       **For Publication in West**
                                )       **Bankruptcy Reporter.**


MEMORANDUM DECISION REGARDING CHAPTER 13 TRUSTEE'S
OBJECTION TO CONFIRMATION OF DEBTOR'S FIRST AMENDED PLAN

This case is governed by the Bankruptcy Code (11 U.S.C.) as

amended by the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23

(generally effective Oct. 17, 2005) ("BAPCPA").  The parties are

in agreement that 11 U.S.C. § 1325(b)(3) applies to the

calculation of the debtor's projected disposable income under 11

U.S.C. § 1325(b)(1)(B), and that under § 1325(b)(3) her housing

expense must be determined, as mandated by 11 U.S.C. § 707(b)(2),

by first looking to the "Local Standards" that the Internal

Revenue Service ("IRS") has issued relating to such housing

expenses.  The debtor asserts that the Local Standards housing

expense applicable to the debtor applies for purposes of

§ 1325(b)(1)(B) even though her actual housing expense is less.

In contrast, the chapter 13 trustee contends that, consistent

with the methodology of the Financial Analysis Handbook of the

Internal Revenue Manual (the "IRM"), the Local Standards act as

only a cap on the amount of the expenditure that the debtor may

claim in calculating a disposable income figure, and that the

debtor's actual housing expense, when less than the Local

Standards figure, should be employed in making the calculation.

For the reasons that follow, I conclude that the debtor is

entitled to use the Local Standards figure even if her actual

housing expense figure is lower.[1]   I additionally conclude that

the debtor's plan complies with the requirement of 11 U.S.C. §

1325(b) regarding commitment of all of her <u>projected</u> disposable

income, and with the requirement of 11 U.S.C. § 1325(a)(3) that

the plan be proposed in good faith.   Accordingly, I will overrule

the chapter 13 trustee's objection to confirmation of the

debtor's plan.

---

[1] This decision reaches a result contrary to my previously vacated oral decision of June 22, 2007, in this case, and my prior oral decision regarding this issue in a separate chapter 13 case involving an entirely different debtor, <u>In re Hare</u>, Case No. 06-00106 (Bankr. D.D.C.).  The debtor in <u>Hare</u> modified her plan to provide for full repayment of unsecured claims following my ruling, and an order confirming the modified plan was entered shortly thereafter.  My ruling today abrogates entirely my oral ruling in <u>Hare</u>.

I

STATUTORY FRAMEWORK

When a debtor seeks relief under chapter 13 of the
Bankruptcy Code, 11 U.S.C. § 1301 et seq., the Code requires that
the debtor file a repayment plan with the court.  11 U.S.C.
§ 1321.  If the requirements for the plan set forth in §§ 1322
and 1325 of the Bankruptcy Code are met, the plan will be
confirmed and the debtor will be eligible to receive an order
discharging most if not all of his debts once its terms are
effectuated.  11 U.S.C. § 1328(a).  If the plan does not comport
with the requirements of §§ 1322 and 1325, the debtor will need
to file an amended plan of reorganization; otherwise, his case
will be converted to chapter 7 of the Bankruptcy Code, 11 U.S.C.
§ 701 et seq., or dismissed outright.  11 U.S.C. § 1307(c)(5).

One of the requirements set forth in § 1325 is that "the
plan provide[] that all of the debtor's projected disposable
income . . . be applied to make payments to unsecured creditors."
11 U.S.C. § 1325(b)(1)(B).  Section 1325(b)(2) defines disposable
income as "current monthly income received by the
debtor . . . less amounts reasonably necessary to be expended."
"[A]mounts reasonably necessary to be expended . . . shall be
determined in accordance with subparagraphs (A) and (B) of
section 707(b)(2), if the debtor has [annualized] current monthly
income . . . greater than . . . the median family income of the

3

applicable State." 11 U.S.C. §1325(b)(3)(A). In turn, §
707(b)(2) (which sets forth a means test for determining whether
a debtor's chapter 7 case is presumptively abusive), states that
the "debtor's monthly expenses <u>shall be</u> the debtor's <u>applicable</u>
monthly expense amounts specified under the National and Local
Standards . . . issued by the Internal Revenue Service for the
area in which the debtor resides." <u>Id</u>. at § 707(b)(2)(A)(ii)(I)
(emphasis added).[2]

The debtor's calculation of disposable income in her
statement of current monthly income (Official Form 22C) includes
a deduction for rent in the amount of $1,012--the expense for
rent listed in the Local Standards table--even though the

---

[2] At least one court has concluded that "[§] 1325(b)(3)
should not be interpreted as categorically substituting the
[§] 707(b)(2) expense restrictions for the 'reasonably necessary'
expense requirement already imposed by [§] 1325(b)(2)," but
instead "should be interpreted as offering a further guideline
for ensuring that the expenses claimed by an above-median-income
debtor are reasonably necessary." <u>In re McGillis</u>, No. HG 06
02982, 2007 WL 1549071, at *8 (Bankr. W.D. Mich. May 15, 2007).
I respectfully disagree with this analysis. Section 1325(b)(3)
does not supplement the phrase "amounts necessary to be expended"
in § 1325(b)(2)--it defines it. The only possible criteria for
determining the reasonableness of a particular expense for
purposes of calculating a debtor's disposable income are those
set forth in § 707(b)(2).

debtor's actual monthly rent is only $446.[3]  The first question

for the court is whether Congress intended for debtors to use the

Local Standards as fixed deductions in the calculation of

disposable income for above median-income debtors or intended for

courts to apply the Local Standards in a manner consistent with

the Financial Analysis Handbook, which directs that "taxpayers

will be allowed the local standard or the amount actually paid,

whichever is less."  IRM § 5.15.1.7(4).  If Congress intended the

former course of action, the court must then consider whether the

debtor's calculation of current monthly income on Official Form

22C controls the calculation of her "projected disposable income"

for purposes of § 1325(b)(1).  Finally, if the court finds that

the debtor's current monthly income as derived from Official Form

22C dictates the debtor's "projected disposable income" under

§ 1325(b)(1), it must decide whether a chapter 13 plan of

repayment that provides less funding to unsecured creditors than

the debtor could actually afford satisfies the requirement of

§ 1325(a) that the plan "be proposed in good faith."  11 U.S.C.

---

[3]  The $1,012 figure comes from the Local Standards table
for housing expenses.  That table gives housing expense values
organized by the date at which the bankruptcy was filed, the
state of residence, and household size.  In this case, the debtor
filed her petition in November of 2006, lives in the District of
Columbia, and has a household size of one.  The corresponding
housing expense is $1,012 per month.  USDOJ.com, Bankruptcy
Allowable Living Expenses (Cases Filed Between October 1, 2006,
and January 31, 2007, Inclusive),
http://www.usdoj.gov/ust/eo/bapcpa/20061001/bci_data/housing_char
ts/irs_housing_charts_DC.htm (last visited Aug. 30, 2007).

§ 1325(a)(3).

## II

## INTERPRETATION OF 11 U.S.C. § 707(b)(2)

Like so many issues raised by BAPCPA's amendments to the
Bankruptcy Code, the question of whether Congress intended for
the values contained within the Local Standards of the Financial
Analysis Handbook to serve as fixed values or caps in determining
a debtor's monthly expenses is a hotly contested one.  Most
courts have held that the figures set forth in the Local
Standards should apply regardless of the debtor's actual

expenses,[4] but a handful of courts have concluded that because
the Financial Analysis Handbook applies the lesser of the values
set forth in the Local Standard or the debtor's actual expenses,

---

[4] See In re Sawdy, 362 B.R. 898, 911-13 (Bankr. E.D. Wis.
2007) ("above-median-income debtors may deduct the Local
Standard[s] amount, regardless of whether they have an actual
ownership expense"); In re Farrar-Johnson, 353 B.R. 224, 230
(Bankr. N.D. Ill. 2006) ("The debtors were entitled to claim [the
Local Standards expense] whether they had it or not."); In re
Fowler, 349 B.R. 414, 415-421 (Bankr. D. Del. 2006) ("[b]y
reference to the National and Local Standards, Congress intended
the [c]ourt to use a chart of standard expenses for all debtors
which could be easily and uniformly applied"); In re Demonica,
345 B.R. 895, 903 (Bankr. N.D. Ill. 2006) (holding that "a debtor
may claim the full Local Standard expense for housing"); In re
Grunert, 353 B.R. 591, 594 (Bankr. E.D. Wis. 2006) ("Treating the
Local Standard deductions for vehicle ownership as fixed
allowances rather than caps on actual expenses is supported by
the plain meaning of the statute ('applicable' versus 'actual'),
the legislative history, and carefully reasoned caselaw."); In re
McGuire, 342 B.R. 608, 613 (Bankr. W.D. Mo. 2006) ("[I]f the
expense is applicable (because the debtor is actually incurring
expenses for the purchase or lease of a vehicle), then because
the monthly ownership amount 'shall be' the 'amount specified' in
the Standards, § 707(b)(2)(A)(ii)(I) mandates that the debtor is
permitted to claim an expense deduction for the full Standard
amount on Form B22C."  (Emphasis in original.)); In re
Chamberlain, No. 02:06-bk-01774-RJH, 2007 WL 1355894, at **1-4
(Bankr. D. Ariz. Apr. 26, 2007) (holding that the "specified
amounts" in the National and Local Standards "are to be used");
In re Zaporski, No. 06-51617, 2007 WL 1186032, at *7 (Bankr. E.D.
Mich. Apr. 17, 2007) (finding "most persuasive . . . the line of
cases that conclude that the IRS Local Standards are fixed
allowances, and not caps on a debtor's actual expenses" (emphasis
in original)); In re Watson, No. 06-11948DK, 2007 WL 1086582, at
**1-5 (Bankr. D. Md. Apr. 11, 2007) ("Without [] belaboring the
issue further, this court adopts not only the conclusion but the
reasoning set forth in In re Fowler.").

courts should do the same in applying § 707(b)(2).[5]  Each side

believes that it is following the plain meaning of the statute,

and the statutory text must serve as the starting point for this

court's analysis as well.  See <u>United States v. Ron Pair Enters.,</u>

<u>Inc.</u>, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation

should be conclusive, except in the 'rare cases [in which] the

literal application of a statute will produce a result

demonstrably at odds with the intentions of its drafters.'").

Section 707(b)(2)(A)(ii)(I) mandates that the debtor's

monthly expenses "shall be," <u>inter</u> <u>alia</u>, the "<u>applicable</u> monthly

expense amounts specified under the . . . Local Standards."

(Emphasis added).  The key to understanding the provision is the

modifier "applicable."  The common meaning of the word is

"capable of being applied; having reference" or "fit or suitable

for its purpose, appropriate."  <u>Oxford English Dictionary</u> vol. I

at 575 (2d ed. 1989).  But to what do the "monthly expense

---

[5]  <u>See</u> <u>In re Rezentez</u>, No. 06-00754, 2007 WL 988055, at *6
(Bankr. D. Haw. Apr. 2, 2007) ("I conclude that, for purposes of
calculating projected disposable income, debtors may deduct the
local standard housing expense or their actual housing expense,
whichever is less."); <u>In re Slusher</u>, 359 B.R. 290, 309 (Bankr. D.
Nev. 2007) ("For better or worse, Congress referred to the IRS
National and Local Standards in Section 707(b)(2)(A).  To
understand what requirements this incorporation imposes would
seem to require courts to look at how the IRS defines these
categories, and how the IRS calculates those expenses."); <u>In re</u>
<u>Hardacre</u>, 338 B.R. 718, 724-28 (Bankr. N.D. Tex. 2006) ("Because
the Local Standards are issued by the Internal Revenue Service,
it is instructive to refer to publications of that organization
for guidance as to the types of 'debt payments' that can reduce
allowances under the Local Standards.").

amounts" described in the provision "hav[e] reference?"  This
question is fraught with difficulty, as Judge Markell of the
Bankruptcy Court for the District of Nevada noted in a recent
decision addressing the provision at issue.  Quoth Judge Markell:

> What does the word 'applicable' mean in this
> context?  Does it mean, as the debtor
> suggests, that you cross-match the debtor's
> location and status against the standards as
> published, and no more?  Or does it mean, as
> the trustee contends, that this court should
> interpret the standards as the IRS would,
> including any direction or discretion given to
> IRS employees by the IRS internal
> publications?

In re Slusher, 359 B.R. at 307-08; see also In re Farrar-Johnson,
353 B.R. at 230 ("An expense could be 'appropriate' for a debtor
to claim because he actually incurs that expense.  It could also
be 'appropriate' to claim because he lives in a certain state and
county and has a household of a certain size, putting him in the
right box on the Local Standards chart.").

Judge Markell opted to interpret "applicable" as meaning the
Local Standard expense as adjusted by the IRM, reasoning that
"[i]n referring to such specialized standards, it would be quite
odd if Congress intended to preclude courts from examining the
context in which the authoring agency . . . used and employed
those standards."  In re Slusher, 359 B.R. at 309.  From his
perspective, if Congress did not want the complete Local
Standards equation to apply, "it would have written
[§] 707(b)(2)(A)(ii)(I) to read, 'The debtor's monthly expenses

9

shall be the monthly expense amounts specified under the National
Standards and Local Standards . . . rather than 'The debtor's
monthly expenses shall be <u>the debtor's applicable</u> monthly expense
amounts specified under the National and Local
Standards . . . .'"  <u>Id</u>. at 309 (emphasis in original).  The
<u>Rezentes</u> court echoed this sentiment.  2007 WL 988055, at *6 ("If
Congress had intended to adopt the IRS Standards but prevent the
courts from looking to the IRS's own interpretations of its
standards, it seems reasonable to expect that it would have said
so explicitly.").  An additional argument supporting this view is
that it seems quite odd that, for purposes of calculating the
disposable income that must be paid under a chapter 13 plan, a
below-median income debtor is limited to actual housing expenses
whereas an above-median income debtor can take the Local
Standards housing expense even though his actual expense is less.

Most courts disagree with Judge Markell.  They focus on
language found later in the same sub-part of § 707(b)(2)
regarding "categories specified as Other Necessary Expenses"
under the Financial Analysis Handbook, for which the debtor may
only claim "<u>actual</u> monthly expenses."  11 U.S.C.
§ 707(b)(2)(A)(ii)(I) (emphasis added).  Because Congress used
the term "actual" in one context (Other Necessary Expenses) and
the term "applicable" in another context (National and Local
Standards), these courts reason that the term "applicable" cannot

10

mean "actual," and conclude that the phrase "applicable monthly

expense amounts" cannot refer to actual monthly expenses as a

consequence.  In re Demonica, 345 B.R. at 902; accord In re

Farrar-Johnson, 353 B.R. at 230-31; In re Grunert, 353 B.R. at

593; In re Zaporski, 2007 WL 1186032, at *6.[6]

At first blush, the interpretation of the statute by the

courts in Slusher and Rezentes would seem to be the more

intuitive reading of § 707(b)(2).  It does seem "quite odd" for

Congress to have passed a law that directs the reader to

numerical values promulgated by the IRS without intending for the

reader to understand the context in which those numbers are used.

The approach taken by these courts has the added virtue of

fulfilling Congress' desire in amending § 707(b)(2) to "ensure

that debtors repay creditors the maximum they can afford."  H.R.

Rep. No. 109-31, pt. 1, at 2 (2005), as reprinted in 2005

U.S.C.C.A.N. 88, 89.  Moreover, I agree with Judge Markell that

---

[6]  The Farrar-Johnson court explained this rationale as
follows:

> Congress drew a distinction in the statute
> between "applicable" expenses on the one hand
> and "actual" expenses on the other.  "Other
> Necessary Expenses" must be the debtor's
> "actual" expenses. Expenses under the "Local
> Standards," in contrast, need only be those
> "applicable" to the debtor--because of where
> he lives and how large his household is. It
> makes no difference whether he "actually" has
> them.

353 B.R. at 230-31.

the terms "applicable" and "actual," while obviously different,
need not be mutually exclusive.  See In re Slusher, 359 B.R. at
308 (reasoning that the term "actual" could refer to "a limited
deduction within the specified categories of Other Necessary
Expenses," whereas the term "applicable" could refer to "a
deduction limited to the amount and type specified by the IRS").

    But looks can be deceiving, and in this case the arguments
which seemed so appealing to me when I first considered this
issue betray some flaws upon closer inspection.  In the first
place, there is some logic in looking only at the values set
forth in the Local and National Standards without considering the
manner in which those values are used by the IRS.  All but one of
the values set forth in the National Standards "come from the
Bureau of Labor Statistics (BLS) Consumer Expenditure Survey,"
IRM § 5.15.17, and the operational costs included in the
transportation expense value set forth in the Local Standards
"were derived from BLS data."  Id.  Those values not derived from
BLS data were created by using either a fixed rate (for
miscellaneous expenses included in the National Standards) or by
determining reasonable expense amounts on a county-by-county
basis (for the values listed in the Local Standards).  Id.

    Regardless of the source of the values, the point is that
the IRS collected and applied objective data in supplying values
for the National and Local Standards.  This raw data is readily

12

adaptable for use in other contexts.  The provisions of the
Financial Analysis Handbook dictating how that data should be
used are not so malleable.  They are instructions directed at a
specific audience (tax collectors) for a specific purpose
(collecting delinquent taxes).  Assuming that Congress did not
intend for debtors and the courts and trustees that oversee them
to become amateur tax collectors, it would be much odder for
Congress to have imported the IRS's internal collection
procedures into the Bankruptcy Code than for Congress to have
referred to the objective data used in applying those procedures
without requiring debtors to follow the procedures themselves.
See In re Chamberlain, 2007 WL 1355894, at *4 ("The IRS is not an
administrative agency that administers the Bankruptcy Code, so
there is no basis for a [c]ourt to defer to its administrative
expertise.").

Such an approach seems odder still when one considers the
function of § 707(b)(2).  "[A] means test reduction for a vehicle
ownership expense is only relevant for purposes of determining
the existence or non-existence of a presumption of abuse," In re
Zaporski, 2007 WL 1186032, at *9, and "[p]resumptions are
typically created to avoid litigation."  In re Fowler, 349 B.R.
414, 420 (Bankr. D. Del. 2006).  "Therefore, if the means test is
intended to create a statutory presumption to determine abuse, it
follows that 'Congress intended [for] the [c]ourt to use a chart

13

of standard expenses for all debtors which could be easily and
uniformly applied.'" In re Zaporski, 2007 WL 1186032, at *9
(quoting In re Fowler, 349 B.R. at 420-21); see also In re
Devilliers, 358 B.R. 849, 862 (Bankr. E.D. La. 2007) ("The IRS
standard deductions provide a uniform and predictable standard
for determining the appropriate level and deductibility of
fluctuating and widely varying expenditures."). In other words,
the detailed methodology set forth within the Financial Analysis
Handbook is not only foreign to the means testing scheme set
forth in § 707(b)(2), but also antithetical to its purpose.

Ultimately, though, it is the language of § 707(b)(2) itself
that is most convincing in interpreting the statute. The
provision at issue refers to "applicable monthly expense amounts
specified under the . . . Local Standards," 11 U.S.C.
§ 707(b)(2)(A)(ii)(I), not "applicable monthly expense amounts
specified under the Financial Analysis Handbook of the Internal
Revenue Manual" or, more simply, "applicable monthly expense
amounts specified under the Internal Revenue Manual." This is
not a trivial distinction. As Judge Wedoff notes in a
comprehensive article on the means-testing provisions imposed by
BAPCPA, the Local Standards (along with the National Standards)
are not located within the Financial Analysis Handbook at all,
but rather are found separately on the IRS's website. Eugene R.
Wedoff, Means Testing in the New § 707(b), 79 Am. Bankr. L.J.

14

231, 254 (2005).  Thus, the reference in § 707(b)(2) to the Local
Standards is not a shorthand way of referring to the Financial
Analysis Handbook, but rather denotes an entirely separate source
of information.

In interpreting the plain language of § 707(b)(2)(A)(ii)(I),
"[i]t seems a sound rule of construction to adopt the simplest,
most obvious interpretation of statutory language[] unless there
are clearly shown, persuasive reasons for doing otherwise."
Baker v. Se. Mich. Shippers Coop. Ass'n, 376 F. Supp. 149, 156
(D. Mich. 1973).  The simplest way to interpret the modifier
"applicable" is to read it as being subordinate to the same
limiting phrase ("specified under the . . . Local Standards") as
the object ("monthly expense amounts") that it modifies.  This
reading puts an end to the apparent ambiguity in the term
"applicable," for it is clear that, within the context of the
Local Standards (as opposed to the Financial Analysis Handbook),
the term must refer to the varying expense amounts listed for
individuals subject to different circumstances.  For example, the
"applicable" housing expense for a debtor with a family of two or
less in the District of Columbia is $1,012, whereas the
"applicable" expense for a debtor in the same locale with four or
more persons is $1,369.  Bankruptcy Allowable Living Expenses,
supra n.3.

The legislative history of BAPCPA supports this reading of

15

§ 707(b)(2)(A)(ii)(I).  As the bankruptcy court noted in <u>Fowler</u>,
a prior version of BAPCPA calculated monthly expenses by
requiring debtors to apply "the expense allowances under the
applicable National Standards, Local Standards, and Other
Necessary Expenses allowance . . . under <u>the Internal Revenue</u>
<u>Service financial analysis</u> for expenses in effect as of the date
of the order for relief."  349 B.R. at 419 (quoting H.R. 3150,
105th Congress (1998)) (emphasis supplied by <u>Fowler</u> court).  The
phrase "under the Internal Revenue Service financial analysis" is
conspicuously absent from the final version of the amended
§ 707(b)(2).  "The change from the prior version evidences
Congress' intent that the [c]ourts not be bound by the financial
analysis contained in the IRM . . . ."  <u>Id.</u>

        Finally, the oddity of there being a disparity regarding how
disposable income is computed for above-median income debtors
(allowing use of the Local Standards housing expense when the
actual expense is less) versus below-median income chapter 13
debtors (who are limited to actual expenses) is an insufficient
basis for interpreting § 707(b)(2) differently.  As Judge Wedoff
noted:

> Allowing a deduction for the amounts specified
> in the Local Standards produces no anomalous
> results; to the contrary, it serves to reduce
> administrative complexity and avoid penalizing
> debtors who choose less expensive housing and
> transportation in order to have funds
> available to meet other needs.

16

Wedoff, _supra_, at 256 n.62.  A presumption of abuse under the
means test of § 707(b)(2) can only arise if the debtor is an
above-median income debtor.  11 U.S.C. § 707(b)(7)(A).  Congress
could rationally have decided that above-median income debtors
present the greater potential for serious abuse, and to have
provided that a presumption of abuse may arise only with respect
to such a debtor as a consequence.  Congress could also
rationally have decided that the means test's presumption of
abuse ought to arise from objective data that require as little
inquiry as possible into the debtor's actual circumstances, with
the burden then shifting to the debtor, as authorized by §
707(b)(2)(B), to rebut that presumption by showing "special
circumstances."

     Similarly, Congress rationally could have decided that the
chapter 13 plans of above-median income debtors present the
greatest potential for abuse, and could have decided to employ
largely objective expense criteria for computing such a debtor's
projected disposable income that must be devoted to the plan.
One of the difficulties in applying the disposable income test
has always been the task of determining whether a particular
expense is a reasonable one.  Congress rationally could have
opted to employ the more mechanical approach of § 1325(b)(3)
(_i.e._, use of the chapter 7 means test expense figures) for such
debtors to bring to bear a degree of objectivity in fixing

17

reasonable expenses.

The use of fixed amounts under the National and Local
Standards relieves the court of the obligation to make largely
subjective judgments regarding what is a reasonable expense.
When an above-median income debtor employs the National Standards
and Local Standards in computing certain expenses for disposable
income purposes, that results in an aggregate amount of expenses
under those Standards that are deemed not to be excessive in
comparison to the expenses of other similarly situated
individuals.  For example, if a debtor elects to spend a modest
amount on housing (compared to the typical debtor) and to devote
the excess over the applicable housing expense under the Local
Standards to vacations, that does not offend the means test: as
long as the aggregate of his expenses are determined utilizing
§ 707(b)(2), then, in terms of aggregate expenditures allowed by
§ 707(b)(2), he is not living better than the average similarly
situated debtor.  When an above-median income debtor's plan
proposes to pay a disposable income computed based on
§ 707(b)(2), he is paying the amount that ought to be expected to
be paid by a debtor who fits within the same categories under the
National and Local Standards.

Nevertheless, this approach will produce some odd results.
A debtor having income just under the median income and having
expenses identical to those of a debtor who has income just over

18

the median income may be required to pay more under a plan than
the above-median income debtor.  This could occur because the
below-median income debtor is limited to his actual housing
expense in computing disposable income whereas the above-median
income debtor employs the housing expense under the Local
Standards and is not limited to his actual housing expense.[7]
However, Congress was free to limit § 1325(b)(3) to above-median
income debtors, and inevitably such line drawing may result in a
few peculiar results when different tests are employed for the
two different categories of debtors.  The existence of those
peculiar results does not demonstrate an absurdity that warrants
interpreting the statute differently than as it is written and
most naturally interpreted.

In § 1325(b)(3), Congress created a mechanical, objective
test for determining those expenses covered by the National and
Local standards in computing disposable income.  By reason of the
requirement in § 1325(b)(3) that amounts reasonably necessary to

---

[7] Indeed, if an above-median income debtor's income were to
dip after confirmation of a plan to a below-median income level,
the trustee might argue that he is entitled to obtain a
modification of the debtor's plan under 11 U.S.C. § 1329(a),
limiting him under the modified plan to his actual housing
expense in computing disposable income, and thereby requiring him
to pay more each month than he was required to pay under his
original plan when he was in above-median income territory.
However, the debtor could argue that he is entitled to a trade-
off: by reason of falling into below-median income territory, the
"applicable commitment period" under the modified plan ought to
be for three years instead of the five years that was required to
confirm the original plan.  11 U.S.C. § 1325(b)(4).

be expended for purposes of disposable income "shall be
determined in accordance with subparagraphs (A) and (B) of
section 707(b)(2)," the debtor is free to show "special
circumstances" as described in § 707(b)(2)(B) that "justify
additional expenses or adjustments of current monthly income for
which there is no reasonable alternative" such as "a serious
medical condition or a call or order to active duty in the Armed
Forces."  Congress did not see fit to permit the trustee or
creditors to demonstrate that the expenses for those categories
of expenses covered by the National and Local Standards should be
adjusted downward in computing disposable income based on the
special circumstance that the debtor's actual expenses were less
than set forth by those standards.  Congress could readily have
permitted such an adjustment in computing disposable income, but
it did not.  Nevertheless, as discussed in part IV, <u>infra</u>, an
above-median income debtor's plan that proposes to pay the
debtor's disposable income employing the National and Local
Standards in computing expenses in accordance with § 1325(b)(3)
might still be objectionable in extraordinary circumstances under
§ 1325(a)(3) on the basis of a lack of good faith.

    I recognize the intuitive logic of applying the values set
forth in the Local Standards in a manner consistent with the
Financial Analysis Handbook; indeed, I have twice ruled from the
bench that those standards should apply in determining a debtor's

20

monthly expenses for purposes of § 1325(b).  But after re-

examining the assumptions underlying this logic, the legislative

history of the provision at issue,[8] and, most importantly, the

language of the provision itself, I am convinced that under the

means test of § 707(b)(2), and the disposable income test of

§ 1325(b)(3), which incorporates the expense side of the chapter

7 means test, Congress intended for debtors to use the values set

forth in the Local Standards in calculating their monthly housing

and utility expenses without considering how those values are

used by IRS agents pursuing delinquent taxpayers.  Consequently,

the debtor's claimed housing expense of $1,012 does not violate

_____

        [8]  One of the co-sponsors of BAPCPA, Senator Charles "Chuck"
Grassley of Iowa, opined in a floor statement issued after the
enactment of BAPCPA that it was not "the intent of the law" for
"consumers to claim deductions for expenses a debtor may not even
have."  Floor Statement of United States Senator Chuck Grassley,
December 6, 2006, available at
http://grassley.senate.gov/index.cfm?FuseAction=PressReleases.Det
ail&PressRelease_id=5227&Month=12&Year=2006 (last visited Aug.
30, 2007).  The court respects Senator Grassley's views on this
subject, but his post-enactment articulation of his personal
understanding of the statute's purpose cannot control.  When
Congress enacted BAPCPA, its intent was evidenced by the
legislative history and statutory language with which this court
has wrestled, and utilizing those materials, I have done the best
I can to ascertain Congress's intent.  Congress, as a whole, has
the ability to amend a statute's language if it has led to a
result that Congress deems unwise, but individual members of
Congress cannot change the meaning of that language via post-
enactment comments.
        This is not say that Senator Grassley's concerns are off the
mark.  There is at least a valid question as to whether a debtor
who calculates his disposable income using expenses that he does
not actually have is abusing the chapter 13 process.  I address
this issue in my discussion of the good faith requirement of 11
U.S.C. § 1325(a)(3) below.  See part IV, infra.

§ 1325(b)(3), and the chapter 13 trustee's objection on this
point must be overruled.

III

STATUTORY CONSTRUCTION OF THE TERM
"PROJECTED DISPOSABLE INCOME" IN 11 U.S.C. § 1325(b)

My interpretation of § 707(b)(2)(A)(ii)(I) confirms that the
debtor's calculation of "disposable income" on her Official Form
22C complies with the definition of "disposable income" in
§ 1325(b)(2).  But § 1325 does not require a debtor to funnel his
disposable income to unsecured creditors; rather, it requires him
to commit all of his "projected disposable income to be received
in the applicable commitment period . . . ."  11 U.S.C.
§ 1325(b)(1)(B) (emphasis added).

The modifier "projected" is defined by the Oxford English
Dictionary as meaning "[p]redicted; calculated or forecast on the
basis of current trends or data." Oxford English Dictionary vol.
XII at 599 (2d ed. 1989).  The question is whether Congress
intended for courts to use the "current . . . data" provided by
Official Form 22C as a basis for "calculat[ing]" amounts to be
paid to unsecured creditors (by simply multiplying the current
monthly income times the number of months in the "applicable
commitment period") or, instead, for "forecast[ing]" such amounts
(by using the current monthly income as a starting point for
determining the amount of funding required).

Not surprisingly, courts have split over this issue, albeit

22

in a lopsided fashion.  Most courts have followed Judge Thurman's
decision in <u>In re Jass</u>, 340 B.R. 411 (Bankr. D. Utah 2006), and
Judge Nelms's decision in <u>In re Hardacre</u>, 338 B.R. 718 (Bankr.
N.D. Tex. 2006), in concluding that "[§] 1325(b)(1)(B)'s
requirement that a plan propose to pay 'projected disposable
income' means that the number resulting from Form 22C is a
starting point for the [c]ourt's inquiry only."  <u>In re Jass</u>, 340
B.R. at 415; <u>see also</u> <u>In re Hardacre</u>, 338 B.R. at 722 ("The court
believes that the term 'projected disposable income' must be
based upon the debtor's anticipated income during the term of the

plan, not merely an average of her pre[-]petition income.").[9]  A
smaller number of courts agree with Judge Leonard's conclusion in
In re Alexander, 344 B.R. 742 (Bankr. E.D.N.C. 2006), that "to
arrive at 'projected disposable income,' one simply takes the
calculation mandated by § 1325(b)(2) and does the math."  Id. at

   [9]  Accord Kibbe v. Sumski (In re Kibbe), 361 B.R. 302, 307-
15 (B.A.P. 1st Cir. 2007); In re Upton, 363 B.R. 528, 532-34
(Bankr. S.D. Ohio 2007); In re Edmondson, 363 B.R. 212, 214-18
(Bankr. D.N.M. 2007); In re Carlton, 362 B.R. 402, 405-06 (Bankr.
C.D. Ill. 2007); In re Riggs, 359 B.R. 649, 650-53 (Bankr. E.D.
Ky. 2007); In re Laplana, 363 B.R. 259, 264-66 (Bankr. M.D. Fla.
2007); In re Slusher, 359 B.R. at 294-300; In re Devilliers, 358
B.R. at 856-59; In re Ward, 359 B.R. 741, 744 (Bankr. W.D. Mo.
2007); In re Pak, 357 B.R. 549, 551-53 (Bankr. N.D. Cal. 2006);
In re Casey, 356 B.R. 519, 522-24 (Bankr. E.D. Wash. 2006); In re
Thicklin, 355 B.R. 856, 858-59 (Bankr. M.D. Ala. 2006); In re
Sparks, 360 B.R. 224, 228 n.11 (Bankr. E.D. Tex. 2006); In re
Balcerowski, 353 B.R. 581, 589-90 (Bankr. E.D. Wis. 2006); In re
LaSota, 351 B.R. 56, 58-63 (Bankr. W.D.N.Y. 2006); In re Edmunds,
350 B.R. at 645-47; In re Wayman, 351 B.R. 808, 811 n.7 (Bankr.
E.D. Tex. 2006); In re Demonica, 345 B.R. at 899-900; In re
McPherson, 350 B.R. 38, 42-48 (Bankr. W.D. Va. 2006); In re
Risher, 344 B.R. 833, 834-37 (Bankr. W.D. Ky. 2006); In re Dew,
344 B.R. 655, 659-61 (Bankr. N.D. Ala. 2006); In re Grady, 343
B.R. 747, 750-52 (Bankr. N.D. Ga. 2006); In re Fuller, 346 B.R.
472, 475-83 (Bankr. S.D. Ill. 2006); In re McGuire, 342 B.R. at
613-14; In re Renicker, 342 B.R. 304, 307-09 (Bankr. W.D. Mo.
2006); In re Mullen, No. 06-33607-RLD13, 2007 WL 1452234, at **5-
8 (Bankr. D. Or. May 14, 2007); In re Watson, 2007 WL 1086582, at
**5-7; In re Nowlin, No. 06-34785, 2007 WL 1095449, at **2-3
(Bankr. S.D. Tex. Apr. 11, 2007); In re Grant, No. 06-32299, 06-
32318, 2007 WL 858805, at **6-9 (Bankr. E.D. Tenn. Mar. 19,
2007); In re Zimmerman, No. 06-31086, 2007 WL 295452, at **2-8
(Bankr. N.D. Ohio Jan. 29, 2007); In re Foster, No. 05-50448 HCD,
2006 WL 2621080, at **3-8 (Bankr. N.D. Ind. Sept. 11, 2006).

749.[10]

    <u>Alexander</u> and its progeny reason that the textual changes made to § 1325(b)(2) by BAPCPA dictate their reading of § 1325(b)(1).  There is some merit to this position.  Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child)" less reasonably necessary expenses.  11 U.S.C. § 1325(b)(2).  "[C]urrent monthly income," as defined by the Bankruptcy Code,

> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--
>> (I) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>> (ii) the date on which the current income is determined by the court for purposes

---

    [10] <u>Accord</u> <u>In re Brady</u>, 361 B.R. 765, 768-75 (Bankr. D.N.J. 2007); <u>In re Miller</u>, 361 B.R. 224, 228-35 (Bankr. N.D. Ala. 2007); <u>In re Hanks</u>, 362 B.R. 494, 496-501 (Bankr. D. Utah 2007); <u>In re Tuss</u>, 360 B.R. 684, 690-96 (Bankr. D. Mont. 2007); <u>In re Girodes</u>, 350 B.R. 31, 36-38 (Bankr. M.D.N.C. 2006); <u>In re Rotunda</u>, 349 B.R. 324, 326-33 (Bankr. N.D.N.Y. 2006); <u>In re Farrar-Johnson</u>, 353 B.R. at 227-30; <u>In re Barr</u>, 341 B.R. 181, 183-86 (Bankr. M.D.N.C. 2006); <u>In re McGillis</u>, 2007 WL 1549071, at **3-5 ; <u>In re Winokur</u>, Nos. 06-10735-RGM, 06-11123-RGM, 06-10503-RGM, 2007 WL 174011, at **1-2 (Bankr. E.D. Va. Jan. 18, 2007).

>               of this title if the debtor does not file
>               the schedule of current income required
>               by section 521(a)(1)(B)(1); and
>           (B) includes any amount paid by any entity
>           other than the debtor (or in a joint case the
>           debtor and the debtor's spouse) on a regular
>           basis for the household expenses of the debtor
>           or the debtor's dependents (and in a joint
>           case the debtor's spouse if not otherwise a
>           dependent), but excludes benefits received
>           under the Social Security Act, payments to
>           victims of war crimes or crimes against
>           humanity on account of their status as victims
>           of such crimes, and payments to victims of
>           international terrorism (as defined in section
>           2331 of title 18) or domestic terrorism (as
>           defined in section 2331 of title 18) on
>           account of their status as victims of such
>           terrorism.

11 U.S.C. § 101(10A).

Should a court interpret "projected" to mean that it should compute "disposable income" as thus defined or, instead, as meaning that the court should forecast that "disposable income?" Strictly speaking, it would be absurd to attempt to forecast the debtor's "average monthly income . . . derived during the 6-month period ending on . . . the last day of the calendar month immediately preceding the date of the commencement of the case" unless one anticipated the filing of a new bankruptcy petition at some point in the future.  But the alternative is no less confounding, for if, as the Alexander court suggests, the modifier "projected" means only that the debtor must multiply his "current monthly income" figure from Official Form 22C less the expenses calculated on that same form (for above-median income

26

debtors) or on Schedule J (for below-median income debtors) by
the number of months in the applicable commitment period, then
the only way to give any meaning to the phrase "to be received in
the applicable commitment period" would be to conclude that a
debtor must commit only that portion of the product of his
calculation that is "to be received" by the debtor; i.e., the
lesser of his Official Form 22C figure and his actual anticipated
monthly income.[11]  Such an interpretation would make a mockery of
§ 1325(b)(1).

One way or the other, a court must do violence to the "plain
meaning" of § 1325(b)(1) to effectuate Congress's intent in
amending it.  In deciding which way to proceed, a court is guided
by the prior practice of courts in interpreting § 1325(b)(1) and
the legislative history of the statute.  Both of these factors
weigh heavily in favor of the Jass and Hardacre approach.

Before BAPCPA became effective in 2005, there was no
question that the phrase "projected disposable income" referred
to income that was predicted for the future, not calculated from

---

[11]  Alternatively, an interpretation that straddles the two
different meanings of "projected" is to read the statute as
requiring debtors to commit the average of their income that is
received in both (1) the six months prior to the commencement of
the case and (2) the "applicable commitment period;" i.e., the
three or five years following confirmation of the debtor's plan.
This alchemistic construction strikes me as implausible.

the past.[12]  Courts used a debtor's schedules as a "starting

point" for predicting the debtor's future income as a matter of

practice, but the figure arising from those schedules was not

determinative.  In re Jass, 340 B.R. at 417.  Not only could a

party-in-interest successfully object to the debtor's plan under

§ 1325(b)(1) if the income listed by the debtor was inaccurate or

the expenses unreasonable (i.e., if the debtor's calculation of

"disposable income" for purposes of § 1325(b)(2) was flawed), it

could also object if there was a change in the debtor's

circumstances such that the debtor's anticipated income differed

from his current income.[13]  No court worth its salt would "simply

take[] the calculation mandated by § 1325(b)(2) and do[] the

---

[12]  As Judge Markell notes in Slusher, "the term 'projected
disposable income' as used in [§] 1325(b)(1)(B) does not exist in
isolation in the Bankruptcy Code," but rather "appears in five
other places in the Code, none of which define it, and only one
of which refers back to the definition of 'disposable income'
provided in [§] 1325(b)(2)."  In re Slusher, 359 B.R. at 297.
"Congress' choice to use both 'projected disposable income' and
'disposable income' in the Code indicates an intent to apply
different meanings to the two terms."  Id.

[13]  See In re Kibbe, 361 B.R. at 307 n.5 ("While Schedule I
was the main reference for determining a debtor's income, other
evidence, such as the testimony of the debtor, was considered in
the event that the court believed Schedule I to be an inaccurate
predictor of future income."); In re Pak, 357 B.R. at 553
("Commonly, pre-BAPCPA, chapter 13 debtors anticipated changes in
their financial circumstances during the term of the plan and
structured their proposed payments accordingly.  Alternatively,
when debtors' proposed payments did not reflect anticipated
increases in income or diminished expenses during the term of the
plan, the chapter 13 trustee or a creditor objected to the plan
as not contributing all of the debtor's disposable income to the
plan.").

math." <u>In re Alexander</u>, 344 B.R. at 749.

Given the prior practice of courts in interpreting the phrase "projected disposable income," one would have expected Congress to have altered the phrase, provided a different definition for the old modifier, or at least made clear in the legislative history of its other amendments to § 1325(b)(1) that this practice was incorrect.  Congress did none of these things. The only changes that it made to § 1325(b)(1) were to substitute the phrase "applicable commitment period" for "three-year period" and specify that projected disposable income be used to pay "unsecured creditors" instead of creditors in general.  It provided no definition for the modifier "projected."  And the House Report for BAPCPA says nothing whatsoever about the meaning of the modifier "projected" or the phrase "projected disposable income" in § 1325(b)(1).  H.R. Rep. No. 31, at 318.

"Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 537 (1994).  Interpreting the term "projected" in the manner done by the <u>Alexander</u> court would effectively re-write § 1325(b)(1) without congressional approval.[14]  Moreover, this

---

[14]  <u>See</u> <u>In re McGuire</u>, 342 B.R. at 614 (interpreting the phrase "projected disposable income" by referencing pre-BAPCPA case law because "[t]he BAPCPA amendments do not appear to change that holding").

sub silentio revision of § 1325(b)(1) conflicts with 11 U.S.C.
§ 1329, which permits debtors to modify their confirmed plans
based on, inter alia, changes in financial circumstances.[15]  As
one court sagely noted, "[i]t makes little sense for Congress to
include in the Bankruptcy Code the flexibility provided by
§§ 1323 and 1329 permitting modification of a plan when a
debtor's financial circumstances change . . . , but not to
provide for a realistic determination of the debtor's ability to
make payments in the first place."  In re Zimmerman, 2007 WL
295452, at *6.

        The purpose underlying § 1325(b) further indicates that the
interpretation of "projected disposable income" used by the Jass
and Hardacre courts is correct.  "The concept of projected
disposable income was first introduced into the Bankruptcy Code
with the 1984 amendments and 'was intended to be an economic test
of the debtor's best efforts.'"  In re Carlton, 362 B.R. at 405
(quoting 2 Keith M. Lundin, Chapter 13 Bankruptcy § 163.1 (3d ed.

---

        [15]  "Statutory construction . . . is a holistic endeavor,"
United Savings v. Timberg of Inwood Forest, Ltd., 484 U.S. 365,
371 (1988), as the Supreme Court noted recently in interpreting
certain language found in 11 U.S.C. § 706(a).  See Marrama v.
Citizens Bank of Mass., 127 S. Ct. 1105, 1109 (2007) (construing
provision that a "debtor may convert" his case to chapter 13 "at
any time" by looking at the language "in connection with the
other provisions of the Code, and the Bankruptcy Rules").  In
this case, it is only "[b]y viewing the historical calculations
of disposable income through the prism of current circumstance[]
[that] the [c]ourt may both 'project' [a] debtor's future
disposable income and give effect to the entirety of the Code's
provisions."  In re Devilliers, 358 B.R. at 859.

2000)).  The inclusion of the test in § 1325 ended the "hotly

contested issue" of whether a debtor needed to commit some

minimal amount of funding to unsecured creditors in his plan of

repayment to satisfy the "good faith" requirement of of § 1325(a).

In re McGillis, 2007 WL 1549071, at *17.[16]  The test effectively

imposed an unrebuttable presumption of "bad faith" on all plans

that proposed to commit fewer funds toward the payment of

unsecured creditors than the debtors proposing the plans could

actually afford.[17]  Calculating debtors' "projected disposable

income" "by utilizing their actual disposable income, and not the

pre-petition and backward looking disposable income calculation

on [Official Form 22C], is in harmony with the requirement that

[debtors] are to propose a plan in good faith under section

1325(a)(3)."  In re Grady, 343 B.R. at 751 (emphasis in

original).[18]

---

[16]  See also Conrad K. Cyr, The Chapter 13 "Good Faith"
Tempest: An Analysis and Proposal for Change, 55 Am. Bankr. L.J.
271, 272-73 (Summer 1981) ("The controversy concerning the
chapter 13 'good faith' test has resulted in more litigation than
any other issue to arise since the enactment of the Bankruptcy
Code.").

[17]  I am not familiar with any authority casting § 1325(b)
in those specific terms, but that has been the undeniable effect
of the "projected disposable income" test.  The amendments made
by Congress to § 1325(b) in BAPCPA only strengthen my confidence
in this formulation, as it linked § 1325(b) with § 707(b), which
explicitly addresses the circumstances giving rise to a
presumption of abuse in the filing of a case under chapter 7.

[18]  Even those courts following Alexander admit that the
Jass and Hardacre approach does a much better job of effectuating

Nothing in the text or legislative history of BAPCPA
suggests that Congress intended to abandon the principles that
led to the creation of the projected disposable income test
twenty-three years ago.  To the contrary, Congress crafted the
means test to "ensure that those who can afford to repay some
portion of their unsecured debt [be] required to do so."  151
Cong. Rec. S2470 (March 10, 2005).  "If the purpose of the
disposable income calculations in the [c]hapter 13 context is to
ferret out exactly how much money a debtor has available to pay
creditors . . . then looking only to the income the debtor made
in the six months before he files does not further that
objective."  In re Balcerowski, 353 B.R. at 590.

Indeed, interpreting the phrase "projected disposable
income" to refer to income predicted for the future actually
leads to results more in tune with the "means test" set forth in
§ 707(b) than simply calculating a figure based solely on income
received in the past.  Section 707(b)(2)(B) provides that an

_____

the purpose behind the creation § 1325(b) in the first place.
See, e.g., In re Hanks, 362 B.R. at 502 (expressing appreciation
for "the logic and desire of returning to a chapter 13 practice
that more closely resembles pre-BAPCPA practice"); In re Rotunda,
349 B.R. at 331 ("It is understandable that courts would attempt
to interpret the word 'projected' in such a way that supports the
overwhelming sense that debtors seeking a 'fresh start' must make
every effort to pay their unsecured creditors as much as possible
during the 'applicable commitment period.'"); In re Alexander,
344 B.R. at 750 ("To veterans of [c]hapter 13 practice, it runs
afoul of basic principles to suggest that a debtor with no
disposable income can nonetheless propose a confirmable plan.").

32

above-median income debtor in chapter 7 may rebut the presumption

of abuse arising from § 707(b)(2)(A) by demonstrating "special

circumstances . . . that justify additional expenses or

adjustments of current monthly income for which there is no

reasonable alternative."  11 U.S.C. § 707(b)(2)(B)(I).  Thus, a

debtor who receives disposable income barely above the median for

the area in which he lives but loses his job two weeks before he

files for bankruptcy might be able to rebut the presumption of

abuse arising by virtue of the means test by demonstrating that

his job loss constitutes a "special circumstance[]."

Section 1325(b)(3), which governs the calculation of

"[a]mounts reasonably necessary to be expended under

[§ 1325(b)(2)]," provides that such expenses "shall be determined

in accordance with subparagraphs (A) <u>and (B)</u> of section

707(b)(2)," 11 U.S.C. § 1325(b)(3) (emphasis added).  But this

incorporation of the "special circumstances" exception only

applies to the expense side of the "disposable income" equation.

Nothing in § 1325(b)(2), or § 1325(b) in general, permits a court

to consider "special circumstances" that would lead to

"adjustments of current monthly income" as contemplated by

§ 707(b)(2)(B).

This discrepancy permits two possible inferences regarding

for a debtor whose declining income is a "special circumstance"

under § 707(b)(2)(B)(I).  Either Congress intended to make it

33

harder for such a debtor to submit a confirmable plan of
repayment in chapter 13 than to qualify for chapter 7 relief,
which makes no sense given Congress' expressed preference for the
maximal repayment of debt, or Congress recognized that the
projection of the debtor's income for purposes of § 1325(b)(1)
would already take into account "special circumstances"
warranting "adjustments of current monthly income" because the
projection would be a forecast of the debtor's future income, not
a calculation based on his past income.[19]

---

[19]   In the case of expenses, but not in the case of income,
it was necessary for § 1325(b)(3) to incorporate § 707(b)(2)(B)
in the calculation of disposable income for an above-income
median income debtor.  This follows from the meanings ascribed to
the terms "current monthly income" and "amounts reasonably
necessary to be expended" in § 1325(b)(2) and (3).
     A debtor's current monthly income is based on the debtor's
actual income (less certain excluded types of income) over a six-
month period.  Consequently, the only "special circumstances"
that could lead to "adjustments of current monthly income" would
be those circumstances rendering the debtor's actual current
income at variance from the six-month average of the debtor's
income.  These circumstances would be included in any forecast of
the debtor's monthly income, eliminating the need for any
reference to § 707(b)(2)(B) in § 1325(b)(2).
     In contrast, the debtor's calculation of monthly expenses is
not a tally of the debtor's actual expenses, nor does it reflect
the expenditures made by the debtor in the past.  Rather,
expenses are calculated in large part based on the figures set
forth in the IRS's Local and National Standards "as in effect on
the date of the order for relief."  11 U.S.C.
§ 707(b)(2)(A)(ii)(I).  The only "special circumstances" that
could "justify additional expenses" would be circumstances not
contemplated by § 707(b)(2)(A), which would not be included in a
forecast of the debtor's monthly expenses if the debtor were
limited to the expenses specified by § 707(b)(2)(A).  It was
therefore necessary for Congress to reference § 707(b)(2)(B) in
§ 1325(b)(3) (specifying what are reasonable expenses), but not
in § 1325(b)(2).

For all of these reasons, I agree with the <u>Jass</u> and <u>Hardacre</u>
line of cases that the phrase "projected disposable income" in
§ 1325(b)(1) refers to income that it is reasonable to project
that the debtor will receive.  I do not mean to suggest, however,
that a debtor (or other party-in-interest) can simply substitute
the figures set forth in the debtor's schedules for those found
in Official Form 22C in determining projected disposable income.
Neither Schedule I, which is used to compute a debtor's monthly
income, nor Schedule J, which does the same with respect to
monthly expenses, use the same methodology as that set forth in
§§ 1325(b)(2) and 1325(b)(3) (at least, not for above-median
income debtors).[20]  Consequently, Schedule I is only marginally
relevant in determining a debtor's projected disposable income

---

[20]  "The income required to be reported on Schedule I is
different from 'current monthly income' as defined in 11 U.S.C.
§ 101(10A)."  <u>In re Pak</u>, 357 B.R. at 552.  For example, the
definition of "current monthly income" provided in § 101(10A) of
the Bankruptcy Code excludes social security benefits, whereas
Schedule I does not.  Because this methodology must be used in
calculating "disposable income" for both the past (for purposes
of the means test imposed by § 707(b)) <u>and</u> the future (for
purposes of § 1325(b)(2)), "it is not appropriate to disregard
[the current monthly income figure listed in Official Form 22C]
'where the additional income offered to rebut [that figure's]
accuracy is derived from a source that 11 U.S.C. § 101(10A)(B)
specifically excludes from the calculation of [current monthly
income].'"  <u>In re Ward</u>, 359 B.R. at 745 (quoting <u>In re Schnauth</u>,
342 B.R. 601, 606 n.12 (Bankr. W.D. Mo. 2006)).  Instead, "a
court should attempt to predict what the debtor's disposable
income during the term of the plan will be, using the definition
of 'current monthly income' set forth in 11 U.S.C. § 101(10A)."
<u>In re Pak</u>, 357 B.R. at 552.

for purposes of a debtor's chapter 13 plan.[21]   Schedule J is
similarly unhelpful where above-median income debtors are
concerned.  See In re Edmondson, 363 B.R. at 218-19 (holding that
"Schedule J is irrelevant" in computing projected disposable
income for above-median income debtors).

Instead, "courts must consider changes in circumstances,
both increases and decreases to income and expenses, to a
debtor's financial situation, being always guided by the allowed
methodology set forth in the means test."   In re LaPlana, 363

---

[21]   Schedule I can still serve as a starting point for
determining a debtor's projected monthly income, but it will not
always be dispositive, for the debtor's projected monthly income
"shall not include types of income excluded from 'current monthly
income' by section 101(10A) (Social Security Act benefits and
payments to victims of war crimes, crimes against humanity, and
terrorism) and section 1325(b)(2) (child support payments, foster
care payments, and certain disability payments for a dependent
child)." In re Texeira, 358 B.R. 484, 487 n.4 (Bankr. D.N.H.
2006).  In this respect, I respectfully disagree with the Jass
court and those courts that have followed it in allowing or in
some instances compelling debtors to substitute the monthly
income figure listed on Schedule I to determine the debtors'
"projected disposable income." See In re Jass, 340 B.R. at 418-
19; accord In re Upton, 363 B.R. at 532-35; In re Carlton, 362
B.R. at 406-07; In re Mullen, 2007 WL 1452234, at *8; In re
Watson, 2007 WL 1086582, at *7.  Courts engaging in this practice
effectively reject the manner in which "disposable income" is
supposed to be determined under § 1325(b)(2), in so doing giving
credence to the concern expressed in Alexander that "[i]f
'disposable income' is not linked to 'projected disposable
income[,]' then it is just a floating definition with no apparent
purpose." In re Alexander, 344 B.R. at 749.

B.R. at 266 (emphasis added).[22]  Where an above-median income

debtor is concerned, the debtor (or other party-in-interest) must

demonstrate either a change or reasonably anticipated change in

the debtor's income using the methodology set forth in

§ 1325(b)(2) or a change in the circumstances giving rise to the

applicable expense figures dictated by the Local and National

Standards (or a change in actual expenses for those types of

expenses falling under the Other Applicable Expenses category in

the Financial Analysis Handbook) if he wishes to prove that his

future income is any different from his current income.[23]  In the

absence of such evidence, the disposable income figure listed on

the debtor's Official Form 22C will serve as the only evidence of

the debtor's disposable income and will therefore dictate the

amount of funds to be committed to unsecured creditors under the

debtor's plan of repayment.  Official Form 22C will, in other

---

        [22]  Obviously, I cannot follow the methodology of § 101(10A)
insofar as that provision mandates the calculation of an average
figure based on pre-petition data; it is in this respect that the
phrase "projected disposable income" differs from "disposable
income."  But the criteria used to determine that portion of the
debtor's gross income subject to the disposable income
requirement retains its full force.  See n.20, supra.

        [23]  See In re Fuller, 346 B.R. at 484 ("Unless, then, the
IRS standards change, or unless the debtor's state of
residence . . . or household size change, an above-median income
debtor's expenses are going to be exactly the same for every one
of the six months leading up to the filing of the bankruptcy.
Absent those two changes in condition . . . in the future, the
above-median income debtor[']s prospective expenses will be
exactly the same as her historical expenses."  (Emphasis in
original)).

words, have precisely the same function as the debtor's schedules
had pre-BAPCPA: the evidentiary source for a presumption of
disposable income that can be rebutted through the submission of
extrinsic evidence.  See In re Slusher, 359 B.R. at 299 ("The
historical nature of 'dispositive income' is a presumptive guide
to the prospective 'projected disposable income,' but only a
guide.").[24]

In this case, the chapter 13 trustee objects to the debtor's
plan only on the grounds that her "actual" housing expense; i.e.,
the expense listed on the debtor's Schedule J, is less than the
expense provided by the Local Standards for a person in the
debtor's situation.  I have already determined that the amount
listed in the Local Standards, not the amount listed in the

---

[24] My adherence to the methodology set forth in
§§ 1325(b)(2) and 1325(b)(3) renders moot the argument made by
some critics of the Jass and Hardacre approach that "[o]ne of the
aims of the means test was to limit judicial involvement--and so
judicial discretion--by making mechanical the determination of
abuse under section 707(b)," and that "[t]he means test in
section 1325(b)(3) is meant to have the same mechanical effect."
In re Farrar-Johnson, 353 B.R. at 229.  The discretion once
exercised by courts in applying § 1325(b)(1) related entirely to
the methodology used by courts to determine the total amount of
income available for commitment to the chapter 13 plan and the
reasonableness of the debtor's expenses.  That discretion is
extinguished by faithful application of the methodologies set
forth in §§ 1325(b)(2) and 1325(b)(3).  No such discretion is
exercised when, as contemplated by the term "projected disposable
income," the court permits parties in interest to show that the
circumstances relevant to those methodologies--the variables to
be placed in the fixed equations of §§ 1325(b)(2) and 1325(b)(3),
so to speak--have changed or are likely to change since the time
frame addressed by the completed Official Form 22C.

debtor's schedules, controls its calculation of the debtor's
housing expense for purposes of § 1325(b). The trustee has
presented no evidence that the circumstances giving rise to the
claimed expense amount of $1,012 have changed; therefore, the
presumption that this same expense will be incurred by the debtor
in the future and that her disposable income will remain the same
as a consequence is unrebutted.

IV

GOOD FAITH REQUIREMENT OF 11 U.S.C. § 1325(a)

In addition to satisfying the projected disposable income
requirement of § 1325(b), a debtor must demonstrate that his plan
of repayment is filed "in good faith" pursuant to § 1325(a)(3).
A debtor need not commit a specific amount of funding or pay a
minimum percentage of his unsecured debt to propose a plan in
good faith. Barnes v. Whelan (In re Barnes), 689 F.2d 193, 198
(D.C. Cir. 1982) ("We conclude section 1325(a)(3) does not
require any particular level of minimum repayment as a
prerequisite to [c]hapter 13 plan confirmation."). Instead, the
requirement concerns the "honesty of [the debtor's] intention."
Id. at 200.

The means test now incorporated into the "projected
disposable income" requirement accomplishes Congress' goal of
removing discretion from the judiciary, thereby preventing
wayward judges from abusing their discretion by crediting debtors

39

for unreasonable expenses.  Unfortunately, it also introduces a

new means for abuse of the system, as opportunistic debtors may

be able to claim expenses under the Local or National Standards

that they do not actually have.[25]  In those extreme circumstances

where the debtor's manipulation of the means test amounts to an

abuse of the chapter 13 process, the court must deny confirmation

of the debtor's plan even if the requirements of § 1325(b) are

met, for "[§] 1325(b) is a hazard, not a harbor."  In re

McGillis, 2007 WL 1549071, at *25.

That this is the proper interpretation of § 1325(b) is

supported by the analogous treatment of bad faith in the case of

a debtor whose case does not run afoul of the means test's

presumption of abuse under § 707(b)(2).  The § 1325(b)(3)

calculation of disposable income is but a mechanical test for

---

[25]  The potential for abuse of the chapter 13 process exists
regardless of whether one favors the interpretation of
§ 707(b)(2)(A)(ii)(I) advanced by Judge Markell in Slusher over
that advanced by this court because the expenses covered by the
National Standards in the Financial Analysis Handbook, unlike
those covered by the Local Standards, are to be applied
regardless of the debtor's actual expenses even under the IRS's
internal procedures.  See Wedoff, 79 Am. Bankr. L.J. at 255 ("The
IRM makes it clear that the total applicable expense allowance of
the National Standards is to be given to each taxpayer,
regardless of the taxpayer's actual expenditures in any of the
National Standards categories or the taxpayer's total
expenditures in the combined categories.") (citing IRM § 5.15.1.8
¶ 2).  This is yet another reason to disregard Senator Grassley's
floor statement from December of 2006, for it is clear that in
the case of the National Standards, Congress did not intend that
lower actual expenses be employed, as even the IRS does not
substitute lower actual expenses for the National Standards
expenses.

determining that the debtor is proceeding reasonably, but it does

not purport to cover all instances of bad faith that may arise

from the debtor's actual financial circumstances.  It is similar

to the means test of § 707(b)(2), employed to determine whether a

debtor's utilization of chapter 7 is presumptively abusive.  Even

if, after a chapter 7 debtor makes the calculations required by

the means test of § 707(b)(2), the presumption of abuse under

§ 707(b)(2)(A)(I) does not arise or is rebutted, the court is

instructed that when it determines whether a case should be

dismissed as an abuse of chapter 7, the court must consider:

> (A) whether the debtor filed the petition in bad
> faith; or
> (B) the totality of the circumstances . . . of the
> debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

Courts have interpreted § 707(b)(3) as permitting a court to

consider a debtor's actual ability to pay debts in ruling on a

§ 707(b)(1) motion to dismiss based on abuse even if the

presumption of abuse under the means test of § 707(b)(2) has not

arisen in the case or has been rebutted.  See In re McGillis,

2007 WL 1549071, at *20-22 ("ability to pay is a factor in the

totality of circumstance test"); In re Pfeifer, 365 B.R. 187,

192-93 (Bankr. D. Mont. 2007) ("a debtor's ability to pay is

still an important factor under § 707(b)(3), notwithstanding the

means test of § 707(b)(2)"); In re Henebury, 361 B.R. 595, 606-07

(Bankr. S.D. Fla. 2007) ("Either ability to pay or bad conduct in

41

connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3).  (Emphasis in original.)).  But see In re Nockerts, 357 B.R. 497, 505-08 (Bankr. E.D. Wis. 2006) ("while ability to pay is a factor in the totality of circumstances test, . . . if it is the only indicia of abuse, the case should not be dismissed under that test").  When such a debtor converts his case to chapter 13 to avoid dismissal under § 707(b)(1), it stands to reason that the debtor ought not to be able to utilize § 1325(b)(3) (and the expenses provided by the same means test of § 707(b)(2)) as a safe harbor preventing scrutiny of his actual expenses in assessing his actual ability to pay creditors in determining whether bad faith is present.  In re McGillis, 2007 WL 1549071, at * 22.

A handful of courts interpreting § 1325(a)(3) after the enactment of BAPCPA have concluded that a debtor need not commit any more funds to pay unsecured creditors than those required by

42

§ 1325(b)(1) for the plan to be filed in good faith.[26]  I agree with this result as a general matter.  Nevertheless, there may be times when a debtor commits so little income to creditors, relative to his true ability (for example, as a result of a windfall) to make payment to them based on his actual expenses, that his proffered plan suggests a subjective intent not to make a good faith effort at repayment at all.

Consider a hypothetical above-median income debtor who

---

[26]  See In re Farrar-Johnson, 353 B.R. at 231-32 ("The disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan."); In re Alexander, 344 B.R. at 752 ("So long as the debtor calculates the projected disposable income with specific reference to the new definition of disposable income and commits that projected disposable income to pay unsecured creditors for the applicable commitment period, she is in good faith compliance with the Code."); In re Barr, 341 B.R. at 186 ("the debtor's ability to pay and whether the proposed plan commits all of the debtor's disposable income must be determined under section 1325(b) rather than as an element of good faith under section 1325(a)(3)"); In re Winokur, 2007 WL 174011, at *2 ("If the sole objection to the debtor's good faith is that the debtor proposes to pay the amount Congress requires by the mathematical formula, the debtor has complied with the good faith requirement."); but see In re Devilliers, 358 B.R. at 867-68 ("strict and technical compliance with the means test does not necessarily satisfy any debtor['s] burden of good faith"); In re Edmunds, 350 B.R. at 647-49 ("Nothing in the legislative history of [BAPCPA] clearly indicates that Congress intended to change the existing practice in this Circuit of considering a debtor's actual financial situation at the time of filing or the percentage of proposed repayment as elements of good faith."); In re McGillis, 2007 WL 1549071, at **17-28 ("a debtor's ability to fund a [c]hapter 13 plan based upon his current earnings and expenses remains an important consideration for purposes of determining whether the debtor's plan is proposed in good faith under [§] 1325(a)(3) even in those instances when the debtor has successfully withstood an objection brought under [§] 1325(b)").

inherited his expensive home mortgage-free, and whose actual
housing expense is thus zero, but who, under the Local Standards,
would be entitled to a mortgage/rent expense of $1,012 for
purposes of § 1325(b)(3), which, with his other expenses under
§ 727(b)(2), results in a disposable income under § 1325(b)(3) of
only $100 per month.  The hypothetical debtor intends to pocket a
difference of $1,012 between his actual expenses and the expenses
allowed under § 1325(b)(3), and intends to utilize that
difference to fund expenditures on lavish dining out each month,
while only paying $10 per month under the plan. Such intentions
would bespeak a lack of an honest intention to attempt to repay
his creditors; _i.e._, bad faith under § 1325(a)(3), even if his
plan passes muster under § 1325(b)(3).[27]  Utilizing bankruptcy as
a refuge from creditors' collection demands with an intention to
continue a lavish lifestyle without any sincere attempt to repay
creditors falls into that category of extreme circumstances that
justify a finding of bad faith.

   Only those debtors engaging in subterfuge so blatant as to

---

[27]  On the other hand, a debtor who elects to live in modest
housing (relative to the typical debtor of similar means) ought
not be punished for how he elects to devote his resources.  See
In re McGillis, 2007 WL 1549071, at *26 ("I see no reason why a
debtor could not choose a lifestyle more frugal than the one
dictated by a 'good faith' budget and pocket those savings
without running afoul of [§] 1325(a)(3).").  Only a debtor filing
a plan that is so manifestly unfair to unsecured creditors as to
indicate a subjective intent by the debtor not to sincerely and
honestly attempt to repay his debts would be rejected on grounds
of bad faith.

44

indicate that they have "unfairly manipulated the Bankruptcy

Code, or otherwise proposed [their] [c]hapter 13 plan in an

inequitable manner," In re Goeb, 675 F.2d 1386, 1390 (9th Cir.

1983), will run afoul of § 1325(a)(3).[28]  As a practical matter,

the good faith test may seldom produce litigation.  It would

require the party objecting to confirmation to examine the

debtor's schedules to determine if there is a serious discrepancy

---

[28]  Both Goeb and Barnes hold that there is no minimal
payment requirement implicit in § 1325(a)(3), and, while the
Barnes court did not expressly adopt language in Goeb indicating
that a debtor's intention not "to substantially repay unsecured
creditors" is a "relevant" consideration in determining the
debtors' good faith in that case, In re Goeb, 675 F.2d at 1391,
the cases should be read together in determining the scope of the
Barnes court's ruling.  Barnes addressed one narrow situation
(the failure of a debtor to propose a plan making a "meaningful
payment" to unsecured creditors), and expressly declined to
provide "a comprehensive definition of 'good faith'" in resolving
that issue.  689 F.2d at 200.  Moreover, the debtors in Barnes
both devoted their actual disposable incomes to their respective
plans, and the D.C. Circuit quoted with approval the district
court's conclusion that Barnes's plan "offered repayment to the
maximum extent she honestly believed she was capable (and
therefore) met chapter 13's good faith requirement."  In re
Barnes, 13 B.R. 997, 1000 (D.D.C. 1981) (quoted in In re Barnes,
689 F.2d at 197).  This suggests that the Barnes court would find
a debtor's intent to pay actual disposable income a relevant
inquiry if it were interpreting § 1325(a)(3) today, just as the
Ninth Circuit considered a debtor's intent to repay his unsecured
creditors a relevant consideration in Goeb.  (Indeed, the Barnes
court itself considered whether the debtor had engaged in any
behavior "within the ambit of bad faith as traditionally
interpreted" in addition to whether the debtors involved in that
case "engaged in any specific misconduct" or "proposed the plan
for an improper purpose."  689 F.2d at 200.)  In any event,
nothing in my ruling today offends the holding in Barnes, which
addressed whether a plan that failed to provide a meaningful
amount of payment to unsecured creditors was made in good faith,
because this court's analysis concerns only the subjective intent
of the debtor.

between the debtor's actual monthly disposable income and the

disposable income to be committed to unsecured creditors pursuant

to § 1325(b), and then, if such a discrepancy exists, to

investigate the circumstances giving rise to that discrepancy to

ascertain any evidence of subjective bad faith.  Bad faith is not

demonstrated by showing that the debtor elected to spend less on

one class of expenses (in an amount less than the expenses

allowed by § 1325(b)(3)) and more on another class of expenses

(in excess of the expenses allowed by § 1325(b)(3)), and arguing,

without more, that the debtor's actual expenditure on the first

class demonstrates that he has a greater ability to pay than is

indicated by § 1325(b)(3).[29]

---

[29]   See n.27, supra.  Illustratively, the trustee
conceivably could argue in this case that the debtor's plan is
filed in bad faith because the debtor could reduce those expenses
that actually exceed the values set forth in the Local Standards
and then apply the difference between her actual housing expense
and the Local Standards expense towards her plan.  But this takes
things one step too far, for "to sit as a [c]hapter 13 [j]udge
against the backdrop of the panoply of [] forces that shape
debtors' choices does not permit the [j]udge to substitute his or
her value judgments for those of the debtor."  In re LaSota, 351
B.R. at 61.  "All that [§] 1325(a)(3) requires is that the debtor
justify that what he has proposed to keep for himself vis-à-vis
what he proposes to pay his creditors under his plan is a fair
allocation under the circumstances."  In re McGillis, 2007 WL
1549071, at *25.  Moreover, the question is not whether a
debtor's proposed scheme of payments is fair to creditors in an
objective sense, but whether the debtor intends to deal with his
creditors in an equitable fashion.  See id. at *24 (describing
§ 1325(a)(3) as "the subjective counterpart to [§] 1325(b)'s
objective effort to assess" the "debtor's financial
wherewithal").  A debtor does not need to rearrange his life in
conformance with the Internal Revenue Manual to file a plan in
good faith.

46

In this case, the debtor has filed a plan of repayment that commits virtually the same amount of funds to unsecured creditors ($260 per month) as the amount of monthly disposable income that the debtor actually receives ($264). There is no basis for concluding that the debtor's plan is filed in bad faith. The chapter 13 trustee's objection to confirmation will be overruled and the debtor's first amended plan confirmed.

V

CONCLUSION

I freely admit that my decision today may not withstand the test of time. It may well be the case that Congress really intended for debtors to always use the lesser of their actual expenses or the "applicable" IRS guidelines, but erred in its drafting of the statute; that it fully intended for the courts to plug in the average of a debtor's income from the six-month period preceding the filing of the debtor's petition no matter how much the debtor's circumstances may have changed, but failed to make that intention clear in the re-written statute; or even that it intended to allow debtors to hoard as much money as the means test will permit so long as they commit their "projected disposable income" to debtors. Until these thorny issues are sorted out by the various courts of appeal or Congress, no bankruptcy court can say with certainty that it knows how the amended § 1325 should work. Today's decision is an educated

guess, nothing more.

With that _caveat_ in mind, I believe that my decision today is both faithful to the letter and spirit of BAPCPA and practicable for debtors and trustees alike.  In the vast majority of cases, the figures derived from Official Form 22C will decide how much money is to be committed to unsecured creditors in the debtor's chapter 13 plan for above-median income debtors.  Where use of the means test figures would not reflect the reality of the debtor's actual situation to the debtor's disadvantage, the debtor can produce evidence showing a change in income or "special circumstances" warranting an increase in permitted monthly expenses.  Where use of the means test suggests that the debtor intends to manipulate the chapter 13 process in an unfair manner, the chapter 13 trustee and creditors can object under § 1325(a)(3).  The statute can effectuate Congress' desire for uniformity and objectivity without producing absurd results.

As for the plan at issue in this case, I find that it satisfies the requirements of § 1325(b)(1) and that it is filed in good faith as required by § 1325(a)(3).  The trustee's objection will be overruled and the debtor's plan confirmed in light of this decision.

An order follows.

[Signed and dated above.]

Copies to: Debtor; debtor's counsel; chapter 13 trustee.